Affirmed and Memorandum Opinion filed August 26, 2008








Affirmed and Memorandum Opinion filed August 26, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00237-CV

____________

 

GP II ENERGY, INC., GEORGE
MITCHELL, II, AND BRIAN SIRGO, Appellants

 

V.

 

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & MARTIN AND BRIAN L. GENNITY, Appellees

 



 

On Appeal from the 55th
District Court

Harris County, Texas

Trial Court Cause No. 04-59594

 



 

M E M O R A N D U M   O P I N I O N








Three parties entered into an agreement to resolve claims
and interests regarding oil and gas leases in New Mexico.  One party, an
officer of that party, and an officer of another party sued the lawyer and law
firm that had represented the third party to the agreement, alleging that the
lawyer and law firm served as escrow agents and asserting claims for breach of
contract, breach of fiduciary duty, and fraud.  The trial court granted summary
judgment and dismissed the claims.  We affirm.  

                        I.  Factual and Procedural
Background

In 1997, Square Lake Partners, L.L.C. (ASquare Lake@) acquired a
leasehold interest in various oil and gas leases in Eddy County, New Mexico
(hereinafter the AProperties@).[1] 
Appellants/plaintiffs George P. Mitchell II and Brian M. Sirgo both owned
membership interests in Square Lake.  Mitchell and Sirgo, in their individual
capacities, also owned interests in the Properties.  The Properties were
located on land owned by either the United States of America or the State of
New Mexico.  To finance Square Lake=s acquisition of
the leasehold interest in the Properties and its development of the Properties,
Square Lake entered into a financing agreement with Domain Energy Finance
Corporation n/k/a Range Energy Finance Corporation (hereinafter ARange@).  Range agreed
to provide this financing in consideration for Square Lake conveying a
production payment (essentially an overriding royalty interest) carved out of
Square Lake=s working interest.  

Square Lake entered into a joint operating agreement with
appellant/plaintiff GP Energy II, Inc. (hereinafter AGP II@) for the
operation of the New Mexico oil and gas leases.  At the time of this agreement,
Mitchell was the sole shareholder, president, and secretary-treasurer of GP
II.  GP II, as operator, entered into a contract with Gateway Gathering and
Marketing Company to sell crude oil on Square Lake=s behalf and on
behalf of all interest holders.  








Between 1997 and early 2002, Range spent in excess of five
million dollars to finance the acquisition and development of the Properties. 
Nonetheless, due in part to low natural gas prices and higher-than-expected
operating costs, the Properties were not profitably developed.  Square Lake
allegedly failed to pay GP II in excess of $600,000 as of the end of 1999.  GP
II sought to perfect a statutory lien against the Properties.  In November
2000, GP II filed a lawsuit against Square Lake and Range in New Mexico (hereinafter
the ANew Mexico Lawsuit@).  GP II sought
to enforce its operator=s lien under the joint operating agreement
as well as to foreclose on its statutory lien on the Properties.  

Range sought to locate a purchaser for Square Lake=s leasehold
interest in the Properties.  In July 2002, Square Lake, GP II, and Range signed
an agreement effective as of May 31, 2002 (hereinafter the AJuly Agreement@).  Under the July
Agreement, the parties authorized Range to sell the Properties, and they agreed
that Range had the sole responsibility for the final decisions on the purchase,
negotiations on the purchase, the effective date of the sale, and the closing. 
The July Agreement contains several provisions regarding the obligations of the
parties to deliver certain documents to an escrow agent designated by Range,
although no escrow agent is named or designated in that agreement.  At all
relevant times, Range was represented by appellee/defendant Brian L. Gennity, a
lawyer at appellee/defendant Chamberlain, Hrdlicka, White, Williams &
Martin (hereinafter AChamberlain Hrdlicka@).  Neither
Gennity nor Chamberlain Hrdlicka signed the July Agreement.[2] 


On September 17, 2002, Gennity sent counsel for GP II and
Mitchell a written communication by facsimile, in which Gennity stated, ASee if you can get
your original docs signed & overnighted to me by Thurs/Fri if
possible. [sic] to hold as Escrow Agent pursuant to the [July
Agreement].@[3]  








Under the July Agreement, the parties agreed to execute
mutual releases releasing one another and their respective owners and officers
from all claims that any party might have had against the others through the
closing date.  To carry out this agreement, the parties agreed to the form of a
ARelease and
Confidentiality Agreement@ (hereinafter the ARelease@).  In September
2002, Gennity received a counterpart original of the Release that had been
signed by GP II and Square Lake.  

On October 1, 2002, Range entered into a purchase and sale
agreement with CBS Partners, Ltd. (ACBS@) under which that
company would purchase the interests of Range, Square Lake, and GP II in the
Properties.  On October 19, 2002, Gennity received from Range an original
counterpart of the Release fully and unconditionally executed by Range.  The
closing for the purchase by CBS occurred on October 24, 2002.  No lawyer from
Chamberlain Hrdlicka attended this closing.  On the afternoon of October 24,
2002, counsel for CBS sent Gennity a facsimile stating that all closing documents
had been executed and exchanged.  At the closing, GP II, Mitchell, and Sirgo
(hereinafter collectively the ASquare Lake Parties@) received a copy
of the Release reflecting that the Release had been fully and unconditionally
executed by all parties thereto.[4] 
Though the Square Lake Parties received a copy of the page containing the
signature of Range=s representative, they did not receive the
original of this page.  The original of this signature page remained in Gennity=s possession.  
Upon completion of the closing on October 24, 2002, among other things, the
following had occurred:

!       CBS had purchased all of the leasehold
interest in the Properties.

!       GP II had executed a release of its operator=s lien, its statutory lien on the
Properties, and any rights to enforce those liens.  

!       GP II had assigned to CBS all of GP II=s right, title, and interest in the
Properties.

!       GP II had signed an agreed motion to dismiss
with prejudice its claims in the New Mexico Lawsuit.  

!       Square Lake had assigned to CBS all of Square
Lake=s right, title, and interest in the
Properties.








!       Range had assigned to CBS all of Range=s right, title, and interest in the
production-payment interest in the Properties.

Around the time of the closing, CBS notified Range that CBS
had discovered potential claims against GP II regarding the agreement GP II had
entered into with Gateway.  On the day of the closing, Range and CBS agreed to
investigate and pursue these potential claims.[5] 
Gennity testified that Chamberlain Hrdlicka and he did not find out about this
agreement until October 25, 2002.  

Range and GP II agreed that Range was entitled to 83% of
the sales proceeds.  At the closing, GP II and Range further agreed that the
remaining 17% of the sales proceeds would be held by Chamberlain Hrdlicka under
an express escrow agreement.[6] 
Range=s representative
made it clear to Michael Short, counsel for GP II and Mitchell, that in
post-closing adjustments, Range would be expecting to receive an appropriate
accounting from GP II of all revenues and expenses attributable to production
from the Properties for the applicable periods of time covered by all the
existing letter agreements between Range and GP II.  On October 25, 2002, Range
notified GP II that it was investigating a potential post-closing adjustment
under which it would be entitled to some of the escrowed funds.  In the week
following the closing, Range and GP II disagreed as to whether Range should
receive part of the escrowed funds.  








Five days after the closing, on October 29, 2002, a
representative from Range executed a new signature page for the Release
purporting to change the terms of the Release by making the release subject to
various contractual rights of Range, including Range=s alleged right to
recoup costs and receive all revenue attributable to Square Lake=s interest and
Range=s production
payment.  Gennity maintained possession of the original signature page (without
any added language) and never destroyed it or gave it to any person.  On
October 31, 2002, GP II and Range agreed that most of the escrowed funds should
be wired to GP II; however, rights to some of these funds remained in dispute.

In June 2003, CBS and Range filed suit against GP II,
Mitchell, and Gateway in federal court (hereinafter the AFederal Lawsuit@).  In September
2004, GP II and Mitchell settled the Federal Lawsuit.  The following month, the
Square Lake Parties sued Chamberlain Hrdlicka and Gennity (hereinafter the AChamberlain
Parties@) in the trial
court below, alleging, among other things the following:

!       The July Agreement sets forth the duties and
responsibilities of the AEscrow Agent.@

!       By his September 17, 2002 facsimile, Gennity
agreed that the Chamberlain Parties would serve as AEscrow Agent@ for the closing of the CBS
transaction.

!       Before the October 24, 2002 closing, Range
and CBS discussed pursuing claims against GP II after the closing, and CBS
prepared a proposed agreement relating to these claims on October 23, 2002. 
Range entered into this agreement on the following day.

!       Before the October 24, 2002 closing, the
Chamberlain Parties were expressly made aware of Range=s plans to pursue certain claims
against GP II and Mitchell after the closing, even though these claims were being
released by Range in the Release.

!       Both before and after the closing, the
Chamberlain Parties breached their duties to disclose their knowledge that
Range would pursue claims against GP II and against the escrowed funds.

!       After the closing, Gennity and Chamberlain
Hrdlicka participated in drafting changes to the Release, and the altered
Release was signed by Range and given to the Chamberlain Parties on October 29,
2002.   








!       The Square Lake Parties did not learn of the
existence of the signature page for the Release signed by Range on October 29,
2002, until October 3, 2003.  

!       As Escrow Agent under the July Agreement, the
Chamberlain Parties owed the Square Lake Parties a fiduciary duty regarding the
documents that were required to be executed and delivered to the Escrow Agent 
before the closing.

!       The Chamberlain Parties had a duty to
disclose to the Square Lake Parties that (1) Range intended to pursue certain
claims against one or more of the Square Lake Parties some time after the
closing and (2)  Range intended to alter the terms of the Release.   

The
Square Lake Parties sought to recover actual damages, punitive damages, and
attorney=s fees based on
claims for breach of contract, breach of fiduciary duty, and fraud.  Though
they asserted claims for breach of fiduciary duty and fraud, the Square Lake
Parties did not allege that the Chamberlain Parties made any affirmative
misrepresentations; rather, they alleged various breaches by the Chamberlain
Parties of an alleged duty to disclose.

The Chamberlain Parties filed a motion for summary
judgment, in which they asserted the following grounds:

!       The Chamberlain Parties are entitled to
summary judgment on the contract claims because (1) New Mexico law applies to
the July Agreement, (2) under New Mexico law, an escrow agent=s liability is fixed and limited by
the terms of the escrow agreement, and (3) as a matter of law, the Chamberlain
Parties did not breach any terms of the July Agreement.[7]

!       As a matter of law, the Chamberlain Parties
had no legal duty to disclose to the Square Lake Parties any of the information
that the Square Lake Parties claim should have been disclosed because (1) New
Mexico law applies to the July Agreement, (2) under New Mexico law, the escrow
agent would have a duty to disclose only if this duty were contained in the
July Agreement, and (3) in the July Agreement, the parties do not impose any
duty to disclose on the escrow agent.








!       In the alternative, the Chamberlain Parties
had no legal duty to disclose to the Square Lake Parties any of the information
that the Square Lake Parties claim should have been disclosed before closing
because, as a matter of law, the Chamberlain Parties did not learn of this
information until after the closing.  

!       As to any of the information that the Square
Lake Parties claim should have been disclosed after closing, the Chamberlain Parties
are entitled to a summary judgment under Texas Rule of Civil Procedure 166a(i)
because there is no evidence that the alleged nondisclosure of any of this
information caused any of the Square Lake Parties= alleged damages.  

The
Chamberlain Parties submitted various documents as well as affidavits from
Gennity and Rodney Waller, a representative of Range.

In response, the Square Lake Parties asserted, among other
things, the following:

!       Gennity represented to Michael Short, lawyer
for GP II and Mitchell, that Short=s clients would receive global releases.

!       In June 2003, when Range and others sued Short=s clients in the Federal Lawsuit,
it was too late for the Square Lake Parties to set aside the dismissal in the
New Mexico Lawsuit, which dismissal had been procured by fraud.  

!       Gennity breached his contractual duties as
escrow agent under the July Agreement by relinquishing possession of the GP II=s release of lien and the joint
motion to dismiss the New Mexico Lawsuit (hereinafter AGP II Documents@) by allowing them to take effect
and by failing to provide Short=s clients the promised global releases.

!       Gennity breached his fiduciary duty by
failing to disclose to the Square Lake Parties his knowledge that Range was
planning to pursue claims against the Square Lake Parties.  

The
Square Lake Parties attached to their summary-judgment response an affidavit
from Short, excerpts from Waller=s deposition, and
various other documents.  

The trial court granted the Chamberlain Parties= motion for
summary judgment.  On appeal, the Square Lake Parties challenge that ruling.








                                         II.  
Standard of Review

In reviewing a traditional summary judgment, we consider whether the successful
movant at the trial level carried the burden of showing that there is no
genuine issue of material fact and that judgment should be granted as a matter
of law.  KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d
746, 748 (Tex. 1999).  To be entitled to a traditional summary judgment, a
defendant must conclusively negate at least one essential element of each of
the plaintiff=s causes of action or conclusively establish each element of an
affirmative defense.  Science Spectrum, Inc. v. Martinez, 941 S.W.2d
910, 911 (Tex. 1997).  If the
movant=s motion and summary-judgment
evidence facially establish its right to judgment as a matter of law, the
burden shifts to the nonmovant to raise a genuine, material fact issue
sufficient to defeat summary judgment.  M.D. Anderson Hosp. & Tumor
Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000). 

In reviewing a no‑evidence summary judgment, we
ascertain whether the nonmovant pointed out summary‑judgment evidence of
probative force to raise a genuine issue of fact as to the essential elements
attacked in the no‑evidence grounds.  Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 206B08 (Tex. 2002).  A
no‑evidence summary judgment must be granted if the party opposing the
motion does not respond with summary‑judgment evidence that raises a
genuine issue of material fact. See Arguelles v. Kellogg Brown & Root,
Inc., 222 S.W.3d 714, 723 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  








In our de novo review of a trial court=s summary
judgment, we consider all the evidence in the light most favorable to the
nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises
a genuine issue of fact if reasonable and fair-minded jurors could differ in
their conclusions in light of all of the summary-judgment evidence.  Goodyear
Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755B56 (Tex. 2007). 
When, as in this case, the order granting summary judgment does not specify the
grounds upon which the trial court relied, we must affirm the summary judgment
if any of the independent summary-judgment grounds is meritorious.  FM
Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000).

                                                    III. 
Analysis

A.      Did the
July Agreement impose on the Chamberlain Parties the contractual duties and
duties of disclosure alleged by the Square Lake Parties?

On appeal, the Square Lake Parties assert that the
summary-judgment evidence raises a genuine issue of material fact as to whether
Gennity breached the terms of his contract to act as AEscrow Agent@ under the July
Agreement by (1) relinquishing possession of the GP II Documents, (2) allowing
them to take effect, and (3) failing to provide Short=s clients the
promised global releases.[8] 
As to their breach-of-fiduciary duty and fraud claims, the Square Lake Parties
assert on appeal that there is a genuine issue of material fact as to whether
the Chamberlain Parties breached their alleged duty to disclose that they were
not providing the Square Lake Parties with global releases and that Range
intended to pursue certain claims against the Square Lake Parties after the
closing, even though these claims were within the scope of the Release.[9]








The Square Lake Parties assert that the September 17, 2002
facsimile and the July Agreement together constitute the Chamberlain Parties= contract.  For
the purposes of this opinion, we presume, without deciding, that the September
17, 2002, facsimile constitutes the agreement of the  Chamberlain Parties to
serve as the escrow agent designated by Range under the July Agreement. 
However, the September 17, 2002 facsimile contains no terms relating to this
escrow agreement.  Even under the Square Lake Parties= argument, all of
those terms are contained in the July Agreement, which contains a provision by
which the parties agree that the agreement shall be governed by New Mexico
law.  In their motion, the Chamberlain Parties briefed New Mexico law and
asserted as grounds for summary judgment that (1) New Mexico law applies to the
July Agreement, (2) under New Mexico law, an escrow agent=s liability is
fixed and limited by the terms of the escrow agreement, (3) as a matter of law,
the Chamberlain Parties did not breach any of the July Agreement=s terms, (4) under
New Mexico law, the Escrow Agent only has a duty to disclose if this duty is
contained in the July Agreement, and (5) in the July Agreement, the parties do
not impose any duty to disclose on the escrow agent.








The Square Lake Parties have not challenged the
enforceability of the July Agreement=s choice-of-law
provision, and they did not present argument in their opening brief in support
of the proposition that New Mexico law does not apply.[10] 
In addition, the Square Lake Parties have not disagreed with the Chamberlain
Parties= characterization
of New Mexico law.  We conclude that New Mexico law governs the July Agreement
and that, under New Mexico law, an escrow agent=s liability is
fixed and limited by the terms of the escrow agreement.[11] 
See Loyd v. Southwest Underwriters, 169 P.2d 238, 241B42 (N.M. 1946). 
Thus, we now examine the July Agreement.

In pertinent part, the July Agreement provides as follows:

4.       On or prior to Closing, Square Lake shall
execute and deliver to an escrow agent (AEscrow Agent@) designated by Range, an original assignment of all of
Square Lake=s right, title, and interest in and
to the Square Lake Project. . . .

5.       On or prior to Closing, GP II shall execute
and deliver to the Escrow Agent an original Release of Operator=s Lien, in recordable form,
covering all of GP II=s interest in the Operator=s Lien. . . .

6.       Prior to Closing, GP II (and Square Lake
and/or Range, if such parties have filed an answer to the Lawsuit) shall
instruct their respective counsel to execute and deliver to the Escrow Agent on
or prior to the Closing, and Agreed Motion for Dismissal, with an accompanying
order, accomplishing the dismissal, with prejudice, of all claims arising from
or out of the Lawsuit.

7.       On
or prior to Closing, Range shall execute and deliver to the Escrow Agent (i) a
fully executed acknowledged original of a Termination of Conveyance of
Production Payment, and (ii) a fully executed original of a Termination of
Production and Delivery Agreement . . . .

8.       On
or prior to Closing, Square Lake, GP II and Range shall execute mutual releases
releasing each other, and each other=s
respective owners, shareholders, directors, affiliates, subsidiaries, agents,
attorneys and officers (including, but not limited to, George P. Mitchell II,
Manny Sirgo, and Brian M. Sirgo, individually) from any and all claims and
causes of action that any party may have against the other(s) up to and
including the date of Closing of the sale of the Square Lake Project,
including, but not limited to, all claims and causes of action arising out of
the Square Lake Project.

9.       Square
Lake, GP II and Range shall execute and deliver to the appropriate persons any
and all other documents reasonably necessary to accomplish the objectives set
forth in this Agreement.








10.     Upon the Closing of the sale of the Square Lake Project, the
Escrow Agent shall be authorized to deliver to the appropriate parties all
original documents referred to in Sections 4. through 9. above in order to
accomplish the objectives set forth in this Agreement, without the necessity of
any further written instructions from any party hereto.  

In Paragraph 8 of the July Agreement, the parties do not
explicitly agree to deliver the executed Release to the Escrow Agent.  However,
for the purposes of our analysis, we presume without deciding that under the
July Agreement the parties were required to deliver the executed original
Release to the Escrow Agent.  Nonetheless, under the unambiguous language of
the July Agreement, upon closing, the Escrow Agent is authorized, but not
required,  to deliver the original documents, including the Release, to the
appropriate parties without the necessity of any further instructions.  The Chamberlain
Parties= summary-judgment
evidence shows that, at the closing, the parties exchanged all of the closing
documents but that Gennity maintained custody of the original counterpart of
the Release executed by Range.  The Square Lake Parties produced no evidence
that any party requested that the Chamberlain Parties give any person this
original counterpart.  The summary-judgment evidence conclusively proves that
the parties proceeded with the closing and accepted the Release with a copy of
Range=s signature page.[12] 
Though the Escrow Agent was authorized to deliver this original counterpart,
nothing in the July Agreement required this delivery.  As a matter of law, the
Chamberlain Parties= failure to deliver this original
counterpart cannot be a breach of contract.  See Loyd, 169 P.2d at 241B42. Therefore, the
trial court did not err in granting summary judgment as to the claim that the
Chamberlain Parties breached their alleged contract by failing to provide the
Square Lake Parties with this original counterpart. 








As to the Square Lake Parties= allegation that
the Chamberlain Parties breached their alleged contract by relinquishing
possession of the GP II Documents and allowing them to take effect after the
closing, these alleged actions, as a matter of law, violate no duties contained
in the July Agreement.  Under the unambiguous language of the July Agreement,
the Escrow Agent is authorized to deliver original closing documents to the
appropriate parties upon closing without further instructions, and the Escrow
Agent has no duty to wait for the occurrence of any event before delivering any
of these original documents.  Therefore, upon closing, the Escrow Agent had no
duty to wait for any event to occur prior to relinquishing possession of the GP
II Documents or prior to allowing them to take effect.[13] 
See Loyd, 169 P.2d at 241B42. 

In addition, under the unambiguous language of the July
Agreement, the parties imposed no duty on the Escrow Agent to disclose any
knowledge the Escrow Agent might have.  Therefore, as a matter of law, even if
the Chamberlain Parties had knowledge that they were not providing the parties
with global releases or that Range intended to pursue certain claims against
the Square Lake Parties after the closing, the Chamberlain Parties did not have
a duty to disclose this information. See Loyd, 169 P.2d at 241B42.  

The July Agreement does not impose on the Chamberlain
Parties the contractual duties and common law duties of disclosure alleged by
the Square Lake Parties, and the Square Lake Parties have not asserted any
meritorious appellate argument challenging the trial court=s summary
judgment.  








B.      Did the summary-judgment evidence prove as a matter
of law that the Chamberlain Parties had no pre-closing knowledge that Range
intended to pursue claims against the Square Lake Parties or that Range
intended to try to modify the Release?

Gennity testified that the Chamberlain Parties had no
knowledge before the closing that (1) Range and CBS were investigating the
potential claims for revenues allegedly due Range on past oil sales from the
Properties or (2) Range had any intent or desire to modify the Release.[14] 
The summary-judgment evidence does not raise a genuine fact issue regarding the
truth of this testimony.[15] 
Therefore, even under Texas law, the Chamberlain Parties would have had no duty
to disclose before closing because they had no knowledge of these matters
before closing.  See HTM Rests., Inc v. Goldman, Sachs & Co., 797
S.W.2d 326, 329 (Tex. App.CHouston [14th Dist.] 1990, writ denied).  

C.      Did the Square Lake Parties
point to summary-judgment evidence raising a fact issue as to whether the
alleged nondisclosure of information learned by the Chamberlain Parties after
closing caused any of the Square Lake Parties= alleged damages?








The Chamberlain Parties asserted there is no evidence that
the alleged nondisclosure of any information learned by the Chamberlain Parties
after closing caused any of the Square Lake Parties= alleged damages. 
Therefore, the burden shifted to the Square Lake Parties to point out summary‑judgment
evidence of probative force to raise a genuine issue of fact in this regard.  See
Chrismon v. Brown, 246 S.W.3d 102, 108 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  However, in their response, the Square Lake Parties
pointed to no evidence allegedly raising such a fact issue.  For this reason
alone, the trial court did not err in granting summary judgment on this
no-evidence ground.  See id.  Furthermore, under the applicable standard
of review, the summary-judgment evidence did not raise a genuine issue of fact
as to whether the alleged nondisclosure of any information learned by the
Chamberlain Parties after closing caused any of the Square Lake Parties= alleged damages. 
The only alleged damages mentioned in the Square Lake Parties= evidence is Short=s reference to the
attorney=s fees they
incurred in defending the Federal Lawsuit, though he does not specify the
amount of fees incurred by the Square Lake Parties.  Short states that in June
2003, the court in the New Mexico Lawsuit no longer could set aside the
dismissal order, which Short states was procured by fraud.[16] 
However, there is no evidence from Short or any other source that the
disclosure of any information discovered by the Chamberlain Parties after
closing would have prevented Range from filing the Federal Lawsuit, and there
is no evidence that the Square Lake Parties= total attorney=s fees in the New
Mexico Lawsuit and the Federal Lawsuit were higher than they would have been
had the Chamberlain Parties disclosed information they discovered after
closing.  The trial court did not err in granting summary judgment on this
no-evidence ground.  








Having concluded that the Square Lake
Parties= appellate
arguments lack merit, we overrule all issues and affirm the trial court=s judgment.     

 

 

/s/      Kem Thompson Frost

Justice

 

Judgment rendered and Memorandum Opinion filed August 26,
2008.

Panel
consists of Justices Fowler, Frost, and Seymore.

 









[1]  The factual background in this opinion is based on
the undisputed summary-judgment evidence.





[2]  At no time did Gennity or Chamberlain Hrdlicka serve
as legal counsel for GP II, Mitchell, or Sirgo.





[3]  Emphasis in original.





[4]  Counsel for the Square Lake Parties confirmed this
fact at oral argument in this appeal.





[5]  This letter agreement, under its unambiguous
language, was proposed by CBS on October 23, 2002, and agreed to and signed by
Range on October 24, 2002, the closing date.  Range=s representative, Rodney Waller, testified in his
affidavit that CBS and Range executed this agreement on October 23, 2002;
however, his testimony cannot vary the terms of this unambiguous agreement.  In
any event, even if Range entered into this agreement on October 23, 2002, it
would not change the disposition of this appeal.





[6]  In their summary-judgment response, the Square Lake
Parties noted that this escrow agreement is limited in scope, and they do not
seek to recover based on any alleged breach of a duty arising from this escrow
agreement.





[7]  The Chamberlain Parties also asserted that they were
entitled to summary judgment under Texas law.





[8]  The Square Lake Parties list eight issues presented
in their appellate brief; however, the arguments that they brief do not match
up with these issues.  We conclude that the appellate arguments in their brief
are covered as subsidiary questions that are fairly included in the issues
presented.  See Tex. R. App. P. 38.1(e). 
However, to the extent the issues presented go beyond the arguments in the
Square Lake Parties= brief, we conclude that the Square Lake Parties have
waived these issues by failing to provide any argument, analysis, or
authorities.  See Tex. R. App. P.
38.1(h); San Saba Energy, L.P. v. Crawford, 171 S.W.3d 323, 337
(Tex. App.CHouston [14th Dist.] 2005, no pet.). 





[9]  On appeal, the Square Lake Parties also assert that
Gennity made a misrepresentation to them that they Awould be provided global releases.@   However, in their live pleading in the trial court,
the Square Lake Parties did not allege that the Chamberlain Parties made this
or any other misrepresentation.  In addition,  the summary-judgment evidence
does not raise a genuine issue of fact as to whether the Chamberlain Parties
made this or any other alleged misrepresentation. Short testified that his
providing his clients= closing documents to Gennity Awas conditioned on@
Gennity holding the documents in trust and not releasing them until he had
obtained a global release from Range.  However, this is no evidence of a
representation from the Chamberlain Parties.  Short also stated that his
clients Arelied on Mr. Gennity=s representation and agreement that he would hold the [GP II Documents]
in trust pursuant to the [July Agreement].@
This statement is conclusory and, in any event, is derivative of the terms of
the July Agreement.  Finally, Short said that, under the July Agreement, AGennity agreed that he would hold the [GP II
Documents], conditioned on their not being turned over to [Range] until he had
obtained a global release from [Range].@ 
Again, this testimony is derivative of the July Agreement and does not raise a
genuine fact issue about any alleged misrepresentation by the Chamberlain
Parties.





[10]  The Square Lake Parties did not argue that New
Mexico law does not apply in their summary-judgment response or in their
opening appellate brief.  In their appellate reply brief, the Square Lake
Parties  assert that Texas law applies rather than New Mexico law; however,
they cited no legal authorities, and they did not address the New Mexico
choice-of-law clause in the July Agreement.





[11]  Therefore, the Texas cases cited by the Square Lake
Parties regarding the liability of an escrow agent are not on point.





[12]  At oral argument, counsel for the Square Lake
Parties acknowledged that the Square Lake Parties received a copy of the signed
Release at closing.  





[13]  In parts of their briefing, the Square Lake Parties
appear to be arguing that the Chamberlain Parties had a duty not to relinquish
possession of the GP II Documents until the Chamberlain Parties confirmed that
Range had executed a valid and enforceable general release.  To the extent they
make this argument, as a matter of law, the July Agreement imposes no
obligation on the Escrow Agent to inquire into the enforceability of the
Release or to wait for a determination of the enforceability of the Release
before delivering any of the original closing documents.





[14]  This testimony is corroborated by the affidavit of
Rodney Waller of Range.





[15]  In their response, the Square Lake Parties asserted
that an excerpt from Waller=s deposition
raised a fact issue in this regard.  However, under the applicable standard of
review, this excerpt does not raise a genuine issue of material fact as to
whether the Chamberlain Parties had such knowledge before the closing.  In
addition, the statements in Short=s
affidavit regarding this deposition testimony are conclusory, and in any event,
Short does not assert that Gennity had this knowledge prior to closing.





[16]  Short makes a conclusory statement that the
dismissal order no longer could be set aside.  He does not cite any
authorities, provide a legal analysis, or explain why his clients could not
have had the dismissal order set aside under New Mexico Rule of Civil Procedure
60.  See N.M. R. Civ. P.
1-060 (allowing trial court to grant relief from final judgment based on fraud,
misrepresentation, or other misconduct of an adverse party if a motion for this
relief is filed within a reasonable time and no later than a year after
rendition of the judgment).